19 F.3d 19
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Pamela REED, Plaintiff-Appellant,
v.
DELTA AIR LINES, INC., Defendant-Appellee.
 No. 93-5031.
 United States Court of Appeals, Sixth Circuit.
 Feb. 24, 1994.
As Amended on Denial of Rehearing and
Rehearing En Banc April 13, 1994.
 
 Before: NELSON and BATCHELDER, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is a sexual harassment case in which the plaintiff seeks damages from her employer because of the misconduct of a first-line supervisor. The employer promptly fired the supervisor when it learned of his inappropriate behavior. Summary judgment was entered in favor of the employer, and the plaintiff has appealed. Upon de novo review, we conclude that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law. We shall therefore affirm the district court's disposition of the case.
 
 
 2
 * The plaintiff, Pamela Reed, started with defendant Delta Airlines in 1978 as a reservation sales agent in Knoxville, Tennessee. Delta's Knoxville office employs about 150 reservation sales agents and eight reservation sales supervisors. Each supervisor oversees a team of fifteen to twenty sales agents, and the supervisors report to the Chief Supervisor, Ms. Deborah Freshwater. Ms. Freshwater, in turn, reports to the Reservation Sales Manager, Ms. Mary Howington. An individual named Shan Harris, who was a Delta employee for 23 years and a reservation sales supervisor throughout Ms. Reed's employment, became Ms. Reed's supervisor in April of 1991.
 
 A. Evidence of a Hostile Environment
 
 3
 Ms. Reed says that sometime during the period between 1980 and 1982--long before he became her supervisor--Mr. Harris cornered her in a stockroom and kissed her. When she reprimanded him, he laughed and left the room. Ms. Reed told a co-worker about the incident, and the story ultimately came to the ears of two other reservation sales supervisors, Messrs. Patterson and McGee. They told Ms. Reed that they thought she was lying and that any future complaints of a similar nature would be grounds for her dismissal. There is no indication in the record that either Ms. Howington or Ms. Freshwater knew about any of this prior to the lawsuit, although their predecessors were aware of the incident.
 
 
 4
 A second episode between Mr. Harris and Ms. Reed occurred eight or ten years later, in November of 1990, at a marketing meeting both were attending in Asheville, North Carolina. Ms. Reed says that Mr. Harris invited her to spend the night with him. She refused and left the meeting early. Ms. Reed did not tell Ms. Howington, Ms. Freshwater, or anyone else at Delta about the incident before bringing suit.
 
 
 5
 During the summer of 1991, according to Ms. Reed, after Mr. Harris had become her supervisor, he initiated discussions in which he questioned her about personal matters, including her recent marital separation. In the course of these conversations he also made personal animadversions on his own marital situation. These discussions became uncomfortable, according to Ms. Reed, when Mr. Harris began to make professions of love and expressed sexual desire for her. Ms. Reed says that she responded to Mr. Harris' overtures by telling him he was crazy.
 
 
 6
 Ms. Reed says there were two occasions that summer when Mr. Harris touched her in an inappropriate manner. Ultimately, she says, Mr. Harris sexually assaulted her. She describes the incident as follows:
 
 
 7
 "... I was going to use his phone. His phone was on the credenza behind him. And I was facing him. And he stands up, stands with his leg in between mine, and pushes me on his desk, and kissed me at that time ... [He] put his hand up my shirt. And he had pushed me down on his desk and pulled my underwear over, put his finger inside of me and kissed my leg."
 
 
 8
 Ms. Reed reported the incident to Marilyn Bible, and through her it came to the attention of Ms. Howington. After promptly investigating the incident and interviewing both parties, Ms. Howington recommended that Mr. Harris be fired for having engaged in sexual activity in the office. (Mr. Harris did not deny that sexual activity occurred, but he gave a different account of the nature of the activity and claimed that Ms. Reed was a willing participant.) Ms. Howington's recommendation was approved, and Mr. Harris was discharged.
 
 
 9
 Aside from these incidents, Ms. Reed says, Mr. Harris repeatedly made sexual comments directed toward her and other female co-workers. On four or five occasions, she says, he issued generalized invitations, before groups of sales agents, to participate in lewd activities with him. She also alleges that Mr. Harris regularly told her she was "sexy" and occasionally picked up magazines and made suggestive remarks to her and others about the women depicted in them. There is no contention that any employee--including Ms. Reed herself--reported any of this to Mr. Harris' superiors.[1]
 
 
 10
 Ms. Reed describes one incident, connected with the birthday of one of her co-workers, that did come to management's attention. To mark the co-worker's birthday, employees put up balloons shaped like breasts along the hallways, in plain view of the staff and customers. Although management clearly was aware of this situation, nobody ordered that the decorations be removed.
 
 
 11
 Delta had a published policy against sexual harassment in the workplace, but Ms. Reed and her co-workers never complained to management about Mr. Harris' conduct or any other workplace conduct they found offensive. Delta contends that they did not complain because Ms. Reed and her co-workers were willing participants in the sexual commentary that occurred in the office. Mr. Harris testified that Ms. Reed was a flirtatious person who regularly talked about her sexual activities, commented on the appearance of male employees, and once asked him, after she had undergone breast implant surgery, if he would like to see her "new" breasts.
 
 
 12
 After Mr. Harris was fired, Ms. Reed requested a transfer out of the Knoxville office. The request was not granted, and Ms. Reed says that she was subjected to various forms of retaliation by co-workers who were upset with her for having caused Mr. Harris to lose his job. Ms. Reed complains that Delta did nothing to ameliorate this situation.
 
 B. Evidence of Quid Pro Quo Harassment
 
 13
 In 1986 Ms. Reed let Delta know that she would like to become a flight attendant. Mr. Harris was aware of this desire, and Ms. Reed says that Harris told her explicitly that he would help her get the flight attendant position if she would engage in sexual intercourse with him. On a subsequent occasion, conversely, when Ms. Reed told Mr. Harris that she was patching things up with her husband. Mr. Harris told her that he would prevent her from getting an in-flight position. Ms. Reed admits, however, that he later told her he would not interfere.
 
 
 14
 Although Ms. Reed acknowledges that Mr. Harris did not have authority to decide whether she would get an in-flight position, she contends his recommendation for the job was crucial to the hiring decision. She maintains, therefore, that her difficulties with Mr. Harris are the reason she was never given the position.
 
 II
 
 15
 Ms. Reed sued Delta in state court under the Tennessee Human Rights Act, T.C.A. Secs. 4-21-101, et seq. Delta removed the case on diversity grounds to the United States District Court for the Eastern District of Tennessee. The parties consented to the assignment of the case to Magistrate Judge Robert P. Murrian, pursuant to 28 U.S.C. Sec. 636(c), for all purposes including judgment. Magistrate Judge Murrian granted a motion by Delta for summary judgment, and this appeal followed.
 
 III
 
 16
 The Tennessee Human Rights Act provides, in relevant part, as follows:
 
 
 17
 "It is a discriminatory practice for an employer to:
 
 
 18
 (1) Fail or refuse to hire or discharge any person or otherwise to discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of such individual's . . . sex . . . ." T.C.A. Sec. 4-21-401.
 
 
 19
 The language of Sec. 4-21-401 closely parallels that of Sec. 2000e-2(a)(1) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e. Although remedies available under the Tennessee Human Rights Act are broader than those provided by Title VII, the standard of employer liability is the same under both statutes. See Trentham v. K-Mart Corp., 806 F.Supp. 692 (E.D.Tenn. 1991); Bruce v. Western Auto Supply, 669 S.W.2d 95, 97 (Tenn.App. 1984). In the absence of contrary Tennessee case law on the subject of employer liability for sexual harassment in the workplace, we are guided in our decision by Title VII cases.[2]
 
 
 20
 The prohibition against discrimination because of sex extends to sexual harassment. Actionable sexual harassment may take a "quid pro quo" form, in which favorable terms of employment are conditioned on submission to sexual advances, or it may take the form of a sexually hostile work environment. Meritor Savings Bank v. Vinson, 477 U.S. 57, 64 (1986).
 
 
 21
 * In the recent case of Harris v. Forklift Systems, Inc., 114 S.Ct. 367 (1993), the Supreme Court declared that a hostile environment claim may be based on a showing that the harasser's conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive." Id. at 370. The Court also said that the plaintiff must "subjectively perceive the environment to be abusive" to such a degree that the conduct "actually altered the conditions of the [her] employment." Id. To succeed on a hostile environment claim based on the conduct of one of the defendant's employees, the plaintiff must articulate a basis on which to hold the employer liable. Vinson, 477 U.S. at 72.
 
 
 22
 The magistrate judge assumed the truth of Ms. Reed's allegations and assumed that Mr. Harris had subjected her to a severe and pervasive sexually-hostile work environment in the summer of 1991. He found, however, that Ms. Reed had made no showing that Delta should be held answerable for the unauthorized misconduct of its employee. The court reasoned that because Delta had taken immediate and effective remedial action by firing Mr. Harris as soon as it had notice of his wrongdoing, there could be no liability on Delta's part.
 
 
 23
 In Vinson, 477 U.S. at 72 (1986), the Supreme Court declined to prescribe a definitive rule on employer liability for harassment at the hands of supervisors. The Court declared, however, that the courts should look to common law agency principles for guidance. Under established agency principles, the Court noted, absence of notice does not necessarily insulate the employer from liability; by the same token, however, there is no invariable rule of absolute liability for sexual harassment practiced by supervisory personnel, whether or not the employer knew or should have known of the misconduct. id. The existence of a grievance procedure and a failure to invoke it are not necessarily dispositive, finally, although facts such as these are "plainly relevant." Id. Unwilling to generalize further, the Court indicated that employer liability for sexual harassment by supervisors is heavily dependent upon "the circumstances of [the] particular case." Id. at 73.
 
 
 24
 In Yates v. Avco Corp., 819 F.2d 630 (6th Cir.1987), where a supervisor with authority to hire, fire, and promote was found to have engaged in sexual harassment against a subordinate at work, and the employer, although it had been placed on notice of the supervisor's apparent inability to conduct himself properly toward the company's female employees, failed to deal with the problem effectively, this court, guided by traditional agency principles, concluded that the employer could be held liable. Yates recognized that "agency liability," as we subsequently termed it, "is not strict and can be negated if the employer responds adequately and effectively once it has notice of the actions." Kauffman v. Allied Signal, Inc., 970 F.2d 178, 184 (6th Cir.), cert. denied, 113 S.Ct. 831 (1992). Kauffman was a case in which the employer did respond "adequately and effectively" once it had notice of what the offending supervisor was doing; when apprised of the facts, the company immediately terminated the wrongdoer's employment. The discharge was held to protect the employer from liability for sexual harassment. Id. at 184-85.
 
 
 25
 In the case at bar Ms. Reed argues that the dismissal of Mr. Harris was not sufficient, Delta's management long having acquiesced in a sexually-charged workplace and having failed to put an end to off-color jokes and commentary. She also argues that Delta's response was too late because management had long been on notice--because of the rude and unstable, albeit non-amorous, behavior for which Harris had been reprimanded--that Mr. Harris was likely to harass employees sexually.
 
 
 26
 Having reviewed the record before us de novo, we are satisfied that Delta's response was sufficient to relieve it of liability. The dismissal of Mr. Harris adequately and effectively eliminated any sexually-hostile work environment created by him, and the response was not untimely. The rude behavior for which Mr. Harris had been reprimanded was not indicative of a propensity to harass people sexually, and Delta had no real notice of any such propensity. None of the earlier incidents involving sexual commentary by Mr. Harris had been reported to Delta, moreover, and the company had no reason to know that the office environment was unacceptable (if it indeed was) to any of its female employees.
 
 
 27
 The fact that Delta did not discipline Mr. Harris earlier does not make its response inadequate. Neither does the fact that Delta took no action against the co-workers who were said to be unpleasant to Ms. Reed after Mr. Harris lost his job. The unpleasantness, if any, was not itself sexual in nature, and the law obviously cannot require a company to insure that its employees will be liked by their peers.
 
 B
 
 28
 Ms. Reed also claims that the district court erred in granting the defendants summary judgment on her quid pro quo claims. In Highlander v. KFC National Mgmt. Co., 805 F.2d 644 (6th Cir.1986), this court set forth the elements of such a claim. The plaintiff must show
 
 
 29
 "(1) that [she] was a member of a protected class; (2) that [she] was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability." Id. at 648.
 
 
 30
 The magistrate found here that even if the other elements of the claim could be proved, Ms. Reed could not establish the fourth element of her case--namely, that any job benefit was made conditional on her compliance with sexual demands, or that she suffered any tangible job detriment by virtue of her refusal to acquiesce. Ms. Reed contends that she was denied a tangible job benefit--the in-flight position she requested--as a result of her refusal to submit to Mr. Harris' requests for sexual favors. Ms. Reed admits that Mr. Harris did not have decisionmaking authority with regard to her bid for an in-flight position, but she says that his recommendation carried significant weight in the ultimate hiring decision. Be that as it may, Ms. Reed has offered no evidence that Mr. Harris did, in fact, give her a less than positive recommendation for the job. According to the affidavit of Mary Howington, Chief Supervisor Freshwater's superior, Harris always expressed support for Ms. Reed's bid for an in-flight job--and the affidavit stands unrefuted. In order to be actionable, the loss of a job benefit must be causally related to the plaintiff's response to sexual demands. Highlander, 805 F.2d at 649.[3]
 
 
 31
 AFFIRMED.
 
 ORDER
 April 13, 1994
 
 32
 BEFORE: NELSON and BATCHELDER, Circuit Judges; and CONTIE, Senior Circuit Judge.
 
 
 33
 The court having received a petition for rehearing en banc, and the petition having been circulated not only to the original panel members but also to all other active judges of this court, and no judge of this court having requested a vote on the suggestion for rehearing en banc, the petition for rehearing has been referred to the original hearing panel.
 
 
 34
 The panel has further reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case; however, the panel has amended its opinion (attached) which has been filed nunc pro tunc. Accordingly, the petition is denied. [Note: Amendments incorporated into opinion.]
 
 
 
 [1]
 Mr. Harris did receive reprimands for other types of unprofessional conduct during his tenure at Delta. He was once reprimanded for insulting a female attorney who was giving a presentation to Delta employees, and he was also rebuked for making a disparaging comment about the female managers at Delta. On two occasions, Delta management expressed dissatisfaction with Mr. Harris' handling of crisis situations that arose at work
 
 
 [2]
 The parties have relied exclusively on federal cases to support their positions concerning employer liability for the harassing conduct of supervisory personnel
 
 
 [3]
 The Supreme Court's recent decision in Harris does not alter our conclusion that a tangible job detriment is required in quid pro quo cases. Although Harris removed the requirement that a plaintiff show concrete psychological harm arising out of sexual harassment, the Harris decision applies only to hostile environment theories of sexual harassment. 114 S.Ct. at 369 ("[i]n this case we consider the definition of a discriminatorily 'abusive work environment' (also known as a 'hostile work environment')")